IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 3:20-cv-415 DPJ-FKB

REAL PROPERTY KNOWN AS
115 ROSEDOWNE BEND
MADISON, MISSISSIPPI 39110                                  DEFENDANT PROPERTY



## FIRST AMENDED VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff United States of America, by and through its undersigned

attorneys, to allege upon information and belief as follows:

**I.    INTRODUCTION**

1.      This is a civil forfeiture action *in rem*, pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

(1)(C), the procedures set forth in Rule G of the Supplemental Rules of Admiralty or Maritime

Claims and Asset Forfeiture Actions, the Federal Rules of Civil Procedure, and 18 U.S.C. § 985,

to forfeit real property that was involved in a money laundering transaction or is traceable to such

property, and/or constitutes or is derived from proceeds traceable to specified unlawful activity—

specifically, wire fraud committed in violation of 18 U.S.C. § 1343 and theft or bribery concerning

programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A)—or a conspiracy to

commit such offenses.  The subject real property is located at 115 Rosedowne Bend, Madison,

Mississippi 39110, and is more particularly described as:

> Lot R-8 ROSEDOWN – BLOCK "R" @ REUNION, a subdivision
> according to the map or plat thereof which is on file and of record in the
> office of the Chancery Clerk of Madison County at Canton, Mississippi, in
> Plat Cabinet E, Slide 50B-51A, reference to which is hereby made in aid
> of and as part of this description

(the "defendant property"). According to the warranty deed, the defendant property is currently owned by Ted DiBiase Jr. and Kristen DiBiase.

## II.     JURSIDICTION AND VENUE

2.      This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture *in rem* under 28 U.S.C. § 1355.[1]

3.      Venue is proper in the Northern Division of the Southern District of Mississippi pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1395(a) because the acts and/or omissions giving rise to the forfeiture occurred in this district and/or pursuant to 28 U.S.C. § 1395(b) because the defendant property is located in this District.

## III.     FACTUAL ALLEGATIONS

### A. **Background Information**

4.      The Mississippi Department of Human Services ("MDHS") was a Mississippi state entity "dedicated to serving others while providing a wide range of public assistance programs, social services, and support for children, low-income individuals and families. The agency seeks to empower families so they can become self-sufficient and responsible for their future success." *See* https://www.mdhs.ms.gov/services/

5.      Among other functions, MDHS was responsible for overseeing the distribution of federal funds from the Temporary Assistance to Needy Families program ("TANF"), the Emergency Food Assistance Program ("TEFAP"), and others. MDHS received in excess of $10,000.00 a year in federal funds.

---

[1] The Court previously found it has both personal—*i.e.*, *in rem* jurisdiction—and subject matter jurisdiction over this dispute. *See* ECF No. 46 at 3.

6.     TANF provided federal funds to states and territories "to fund monthly cash assistance payments to low-income families with children, as well as a wide range of services." *See* https://www.acf.hhs.gov/ofa/programs/temporary-assistance-needy-families-tanf.

7.     TEFAP was a federal program that "help[ed] supplement the diets of low-income Americans by providing them with emery food assistance at no cost." *See* https://www.fns.usda.gov/tefap/emergency-food-assistance-program.

8.     The Mississippi Community Education Center ("MCEC") and Family Resource Center of North Mississippi ("FRC") were non-profit organizations registered in Mississippi, operating under Section 501(c)(3) of Title 26 of the United States Code. At all times relevant to the Complaint, Nancy New was the Executive Director of MCEC and Christi Webb was the Executive Director of FRC. MDHS subgranted TANF and TEFAP funds to MCEC and FRC purportedly so that both MCEC and FRC would help MDHS fulfill the goals and mandates of the TANF and TEFAP federal programs. Since at least in or around 2017, MCEC and FRC were MDHS's largest subgrantees. In turn, MCEC and FRC entered into contracts, such as the contracts discussed herein, with other subgrantees, to distribute the federal benefits and to complete specific projects purportedly designed to further the mission of the underlying federal programs.

9.     Contracts and grants involving federal funds, such as TANF funds, must be awarded pursuant to a competitive procurement process as defined in Title 2, Subpart D of the Code of Federal Regulations ("C.F.R."). *See* 2 C.F.R. § 200.320. Further, the C.F.R. states that "[n]o employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a Federal award if he or she has a real or apparent conflict of interest[,]" including a familial relationship. 2 C.F.R. § 200.318(c).

3

10.     John Davis ("DAVIS") became the Executive Director of MDHS in or around January 2016 and held the position at all times relevant to this Complaint.  As the Executive Director, DAVIS was an agent of MDHS.

11.     Upon information and belief, DAVIS had a close personal relationship with the DiBiase Family, dating back to at least June 2017.  This includes Theodore Marvin DiBiase Jr. ("DIBIASE JR."), his father, Theodore Marvin Dibiase ("DIBIASE SR."), and his brother, Brett DIBIASE ("B. DIBIASE"), all former professional wrestlers.

12.     Priceless Ventures LLC ("PV") was a limited liability company (LLC) registered in Mississippi in or about May 2017; DIBIASE JR. was the agent and manager.

13.     Familiae Orientem LLC ("FO") was a LLC registered in Wyoming on or about June 25, 2018, and, on or about July 17, 2018, it was registered as a foreign LLC in Mississippi. According to records on file with the state of Mississippi, FO self-identified as an "Administrative Management and General Management Consulting Service."  Scott Elliott was the sole manager at the time of formation; on or about June 18, 2019, the registered agent was changed by the filing of an amendment to Heather Buller.

14.     Heart of David Ministries ("HOD") was a faith-based non-profit organization in Mississippi.  DIBIASE SR. was one of the listed incorporators for HOD on the Articles of Incorporation filed with Mississippi in October 1997 and he remained an officer of HOD at all times relevant to this Complaint.

### B. Relationship Between Davis and the DiBiase Family

15.     DAVIS' close, personal relationship with the DIBIASE family is evidenced by extensive communication between DAVIS and the DIBIASE family members.  For example, in a text message sent in or around November 2018 from DAVIS to his administrative assistant,

DAVIS stated that he loves B. DIBIASE like his own child.  In or around December 2018, DAVIS sent a series of messages to his administrative assistant that indicated he was in the hospital. During the conversation, DAVIS mentions that "Teddy" and "Brett" had been by the hospital to visit him.  Later in the conversation, DAVIS indicated that "Ted" was currently with him in the hospital.  In another text message from February 2019, DAVIS's administrative assistant tells DAVIS that she is sending flowers to DAVIS's mother from "Ted."  Upon information and belief, "Brett" refers to B. DIBIASE, and "Ted" and "Teddy" either refer to DIBIASE JR. or DIBIASE SR.

C. **Davis's Pattern of Causing Federally Funded Contracts to be Steered to Entities Controlled by the DiBiase Family Without any Competitive Bidding Process and to Cause Payments to be Made Under those Contracts Without any Significant Work Being Performed**

16.    Upon information and belief, between in or around June 2017 and June 2019, DAVIS caused and directed FRC and MCEC to award several contracts, often involving federal funds, to DIBIASE JR., DIBIASE SR., B. DIBIASE, and to entities that they controlled, and to do so without following the legally required competitive bidding process.  DAVIS orchestrated this plan by providing MDHS funds to MCEC or FRC and by then directing MCEC or FRC employees to award the funds to a member of the DiBiase family or to a person or entity controlled by the DiBiase family.

17.    In addition to causing FRC and MCEC to steer MDHS funded contracts, without following the legally required competitive bidding process, to members of the DiBiase family and to entities they controlled, Davis also caused FRC and MCEC to disburse full or almost-full payment under those contracts to DIBIASE JR., DIBIASE SR., and B. DIBIASE, and to entities they controlled, at or near the outset of the contract period, regardless of the terms of the contract, regardless of whether any work had yet been performed under the contract, and knowing that no

5

significant work would be performed under the contract.  Some of these contracts are detailed below.

18.     In or around June 2017, DIBIASE JR., on behalf of PV, a Mississippi LLC, of which DIBIASE JR. was the agent and manager, signed a contract for $250,000 to act as a "leadership training coordinator" for MCEC and FRC's Families First Mississippi initiative ("FFM").  FRC paid DIBIASE JR. in full on or about June 1, 2017, the first day of the contract period—that is, before PV or DIBIASE JR had performed any material portion of the work required by the contract. Upon information and belief, DIBIASE JR. subsequently conducted only one or two training sessions on the contract, yet PV and DIBIASE JR retained the full amount of the contract payment.

19.     In or around August 2017, FRC paid DIBIASE SR. $250,000.00.  Based on information and belief, this payment was for a contract to hire DIBIASE SR. as a motivational speaker for FFM.  The contract term was from August 2017 through July 2018.  Despite this, FRC paid DIBIASE SR. in full in August 2017.

20.     In a contract that ran from May 22, 2018, through September 30, 2018, FRC paid PV nearly $500,000.00 in TEFAP funds to be used for "emergency food assistance."  Upon information and belief, PV performed no work on the contract, but FRC still paid PV $497,987.00 in TEFAP funds on July 13, 2018.  Upon information and belief, the only work DIBIASE JR completed on this contract was to send a list of food pantry locations to FRC.

21.     In or around May 2018, DIBIASE JR., acting in his capacity as President of PV, signed a contract with FRC for $500,000.00 to act as the leadership outreach coordinator for FFM.  The contract period was from May 2018 through May 2019.  Despite the contract period being one-year long, on or about May 17, 2018—just a few days into the contract period— MCEC paid

DIBIASE JR. $500,000.00.[2] Upon information and belief, DIBIASE JR. performed no significant work under this leadership outreach contract but instead merely provided one or two training sessions—an immaterial amount of work that fell far short of what the contract required.

22.     In October 2018, DIBIASE JR., in his capacity as president of PV, signed a contract for $130,000.00 with MCEC to create the "Law of 16" personal-development training program. He was eventually paid $199,500.00 for this contract.

23.     In December 2018, MDHS signed a contract with B. DIBIASE, representing Recover2, LLC, to teach 24 training sessions on opioids for $48,000.00. The contract ran from December 2018 through June 2019. Recover2 LLC is not a registered company with the state of Mississippi. Restore2 LLC, however, was registered as an LLC in Mississippi on or about August 21, 2018. B. DIBIASE is listed as the only member. It is likely that Recover2 is a typographical error in this contract.

24.     Instead of fulfilling the Recover2/Restore2 contract, B. DIBIASE went to RISE, a drug rehabilitation center in Malibu, California, for four months, from February 11, 2019, through May 11, 2019, and from June 12, 2019, through June 26, 2019. Although the signed contract was directly with MDHS, DAVIS directed MCEC to make four $40,000.00 wire payments, using TANF funds, to cover B. DIBIASE's treatment fees. MCEC coded those funds to make it appear that they were not for B. DIBIASE's drug treatment. DAVIS also visited B. DIBIASE while he was at the treatment center.[3]

---

[2] For DIBIASE's various PV contracts, FRC and/or MCEC also reimbursed travel expenses which included first-class airfare, expensive meals, luxury hotels, and entertainment costs.

[3] These actions are the basis for state criminal charges against six individuals in Hinds County, Mississippi.

25.     In addition to awarding the DIBIASE Family these contracts, DAVIS also hired

B. DIBIASE as a Deputy Administrator at MDHS.  B. DIBIASE held this position for seven

months in 2017.  During that time, MDHS granted $2,000,000.00 in TANF funds to HOD, where

DIBIASE SR. continued to serve as an officer, despite the potential conflict of interest based on

B. DIBIASE's position and their familial relationship.[4]

**D.     Wire Fraud Scheme, Theft of Federal Funds, and Conspiracy to Engage in Wire Fraud and Theft of Federal Funds**

26.     Upon information and belief, as a part of a conspiracy and scheme to defraud, which

involved use of interstate wires, and as part of a conspiracy to engage in theft of over $5,000.00 in

federal funds from entities receiving over $10,000.00 of federal funds annually, DAVIS and

DIBIASE JR. fraudulently (1) entered into the below-described contract with Familiae Orientem

LLC ("FO") for the delivery of social services, to be paid for with federal funds, and (2) caused

funds to be disbursed under that contract with FO, based on materially false and fraudulent

pretenses and the omission of material facts to the effect that FO would perform the services called

for under the contract even though DAVIS AND DIBIASE JR. knew, at the inception of the

contract and all other material times, that, in fact, no significant services would be performed under

the contract and that the actual purpose of entering into the contract and disbursing funds under it

was to enrich DIBIASE JR. by stealing and misapplying funds under the federally-funded contract.

27.     Though it does not appear that DIBIASE JR. was ever an employee of MDHS, upon

information and belief, DIBIASE JR. occupied one of the largest offices in MDHS, right next to

DAVIS's office.  DIBIASE JR. also had a MDHS email address starting in at least February 2018,

and regularly communicated with DAVIS and DAVIS's administrative assistant.  Additionally,

---

[4] After B. DIBIASE left MDHS, an additional grant for $1,562,500.00 was awarded to HOD.

DIBIASE JR. and DAVIS regularly traveled together for MDHS related business.  Even though DIBIASE JR. was not an employee of MDHS, DAVIS included DIBIASE JR. on internal MDHS emails and DAVIS's MDHS administrative assistant arranged meetings, travel, and flower deliveries for DIBIASE JR.

28.     In furtherance of the scheme to fraudulently receive TANF funds, and following the pattern illustrated by prior DIBIASE family contracts, on June 26, 2018, only one day after the paperwork creating FO was filed in Wyoming, DIBIASE JR., in his purported capacity as the President of FO and acting as an agent of FO, and Christi Webb, in her capacity as the Executive Director of FRC—and at DAVIS' direction—signed a contract for the period June 25, 2018, through June 24, 2019.  The contract was signed only one day after FO had come into existence as a corporate entity.

29.     Upon information and belief, MDHS did not engage in a competitive procurement process for this contract as directed by the Code of Federal Regulations.

30.     Federal law enforcement contacted Scott Elliott who indicated that he does not control FO.  He indicated that he was approached by DIBIASE JR., a former employee of his at an insurance company and a personal friend, about helping to set up FO, for which Elliott would receive one percent ownership in the company.  Other than the establishment of FO, Scott Elliott was unaware of any activity conducted by or on its behalf.  Elliott indicated he was not aware of FO receiving any contracts, grants, or payments of any kind.

31.     Upon information and belief, DIBIASE JR. had directed Heather Buller to create the FO LLC in the State of Wyoming.  She filed Articles of Organization on or about June 25, 2021, through Wyoming's online portal, using a computer in Louisiana.

32.     Under the contract, FO was to be paid $1,000,000.00 in federal TANF funds in exchange for "coordinat[ing] and create[ing] the RISE Program serving inner-city youth."

33.     Upon information and belief, DAVIS and DIBIASE JR. caused FRC and FO to enter into the FO contract with intent to defraud and based on the false and fraudulent pretense that work would be performed under the contract when, in fact, both knew at the time they caused FRC and FO to enter into the contract that FO would do no significant TANF-related work on the contract. Rather, upon information and belief, DAVIS and DIBIASE JR conspired and agreed to use the contract as a means to enrich DIBIASE JR by engaging in theft of the payments under this federally-funded contract.

34.     Additionally, DAVIS earmarked the TANF funds provided to FRC for the FO contract in his capacity as an agent of MDHS. When he did so, DAVIS knew that DIBIASE JR. had not performed on previous contracts and knew that he would not cause FO to perform on this one. In causing FRC to enter this FO contract and causing funds to be disbursed under it, DAVIS, acting as an agent of MDHS, intentionally caused over $5,000.00 of TANF funds under the control of MDHS to be misapplied.

35.     Recipients of TANF Funds must follow certain regulations and reporting requirements to make sure the funds are used in alignment with the goals of the TANF Program, which include:

    (a)    Provid[ing] assistance to needy families so that children may be cared for in their own homes or in the homes of relatives;

    (b)    End[ing] the dependence of needy parents on government benefits by promoting job preparation, work, and marriage;

    (c)    Prevent[ing] and reduc[ing] the incidence of out-of-wedlock pregnancies and establish annual numerical goals for preventing and reducing the incidence of these pregnancies; and

(d)     Encourag[ing] the formation and maintenance of two-parent families.

45 U.S.C. § 26.20.

36.     FO's contract with FRC included a non-exhaustive list of 15 responsibilities in its scope of duties that DIBIASE JR. obligated FO to perform.  Those duties included: creating the "RISE Program to address the multiple needs of inner-city youth," identifying the "needed services for successfully linking the youth served with opportunities for self-sufficiency and independence as they... becom[e] adults and adjusted [sic] into livable wage careers[,]" developing and providing a "strategic gen+ approach for implementation within the Rise communities," providing "feedback to FRC for use with parents as they pursue skill-building and education that lead to better jobs and longer-term financial stability[,]" and engaging employers "to assist in improving opportunity and outcomes in the workforce."

37.     The contract contained a clause providing that in event of termination, FO was entitled to receive payment for the work it had completed prior to termination.

38.     Personnel at FRC indicated to the Mississippi State Auditor's Office that DAVIS required staff from MDHS, FRC, and MCEC to attend a "Legislative Launch" and "planning session" at the Westin Hotel in June 2018.  On June 27, 2018, only a few days after the effective date of FO's contract to complete this project and, as discussed below, the day after FRC wrote FO's first check, DAVIS sent an email to MDHS, MCEC, and FRC staff with the subject line "Discussion of new Project-'RISE'".  The email indicated the meeting would be at the Westin Hotel and stated "We will have many issues to work through.  Please come ready to get this completed."  DIBIASE JR. is the first email address listed as a recipient to this email.

39.     Even though FRC and DIBIASE JR. signed a contract that required FO to provide all personnel necessary to carry out the program, at the time that DAVIS and DIBIASE JR. caused

that contract to be executed, they understood and intended that FO would do no significant work under the contract.

40.    Instead, as documentation from the planning session obtained by the Mississippi State Auditor's Office demonstrates, at the inception of the FO contract, DAVIS arranged to have employees of FRC, MCEC, and MDHS fulfill the duties to be performed the contract. In turn, DIBIASE JR did not cause FO to hire or assign sufficient FO personnel to perform the contract.

41.    Personnel at FRC indicated they usually do not pay contracts up front, and instead provide funding throughout the course of the contract.

42.    At DAVIS' direction, however, FRC wrote two checks totaling $700,000.00 to FO: (1) check 2403, dated June 26, 2018, the day the contract was signed, for $350,000.00 and (2) check 2949, dated August 23, 2018, for $350,000.00. Both checks were paid out of FRC's Community Bank account ending in 1405. This means within the first two months of the year-long contract, FO received 70 percent of its compensation for the contract before completing any tangible work on the contract.

43.    As a result of these payments, FO received more than of $10,000.00 in federal funds in 2018.

44.    Upon information and belief, the creation of FO immediately before the signing of the contract and the immediate payment of funds indicates that FO was created for the sole purpose of receiving funds related to the purported contract and that DAVIS and DIBIASE JR. never intended for FO to perform on the contract.

45.    The FRC checks made out to FO placed the TANF funds into FO's care, custody, and control. DIBIASE JR., acting as the agent of FO, deposited the checks into a FO Bank Plus account which DIBIASE JR. controlled.

12

46.     When DIBIASE JR. deposited the FRC checks, he caused, for the purpose of executing a scheme or artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses, representations or promises, the transmission of a wire communication in interstate commerce of certain writings, signs, signals, and pictures, that is, by causing Community Bank to communicate with Bank Plus regarding the transfer of funds.

47.     FRC informed auditors that, after it awarded the grant to FO, FRC attempted to secure monthly monitoring and activity reports.  On August 27, 2018, FRC sent DIBIASE JR. a letter asking him to submit monthly activity reports detailing his performance under the RISE contract for all prior months and all months moving forward.  MDHS, however, instructed FRC that "MDHS, not FRC, was monitoring the subgrant activities of Familiae Orientem, LLC and MDHS maintained all necessary paperwork and documentation related to scope completion and activities and services provided under the subgrant."

48.     MDHS personnel indicated that shortly after the program launch in June 2018, DAVIS claimed the program would be taken "in house" to MDHS, and the project was later abandoned.  Investigation has revealed no evidence that FO or DIBIASE JR. attempted to compile the materials or hire or assign the personnel necessary to complete this contract.

49.     FO received $700,000.00 in TANF funds for the RISE contract only one month after DIBIASE Jr. signed the previously mentioned TEFAP contract between FRC and PV, for which PV received nearly $500,000.00 in TEFAP funds.  No substantive work was completed on either contract.  DAVIS knew that DIBIASE JR. had not completed work on the TEFAP contract when FO received the TANF contract.

50.     From in or around June 2017 through the time of the FO contract, DIBIASE JR. entities had entered into at least five contracts with MDHS and subgrantees, and did not completely

perform on at least three, if not more, of them—but still retained all the funds that he and entities he controlled received under those contracts. Even though DAVIS knew of DIBIASE JR.'s history of non-performance, DAVIS still directed $700,000 in federal funds to be paid to FO before any performance on the contract, which was inconsistent with the terms of the contract.

51. In October 2018, after FO failed to complete any work on the RISE contract and PV failed to complete any work on the TEFAP contract, MCEC, acting as an MDHS subgrantee, awarded DIBIASE JR. and PV an additional contract for creating "Law of 16," personal development and leadership training program, despite the lack of performance from DIBIASE JR.'s companies.

52. DIBIASE JR entered into the FO contract as an officer and agent of FO. FRC paid $700,000.00 in TANF funds to FO for the purpose of creating and executing the RISE Program. As an agent of FO, DIBIASE JR. had no right to use the funds for anything other than their intended purpose. Instead, as detailed below, DIBIASE JR. misapplied more than $5,000.00 of these federal funds that had been awarded to FO and used them for his own personal enrichment by using them to purchase the defendant property. DIBIASE JR. was not entitled to use FO's TANF funds for anything other than the RISE program, and in doing so he deprived FO of the TANF funds.

E.   **Tracing of TANF Funds to the Defendant Property**

53. On or about August 8, 2018, DIBIASE JR. opened a bank account at Bank Plus in the name of Familiae Orientem LLC, on which he was the sole signer ("account 2604"). On that same day the account received two deposits: (1) the first FRC payment for the RISE contract, check 2403, dated June 26, 2018, for $350,000.00, and (2) $5,000.00 from an account in the name of Priceless Ventures LLC. On or about August 30, 2018, DIBIASE JR. deposited the second

14

FRC payment for the RISE contract, check 2949, dated August 26, 2018, for $350,000.00, into the same account. During the life of the account, no other deposits were made.

54.     On or about October 26, 2018, DIBIASE JR. opened two accounts at Renasant Bank: (1) an account ending in 2066 for FO on which he was the sole signer ("account 2066"), and (2) a personal account ending in 4599 on which he and his wife, Kristen DiBiase, both had signature authority ("account 4599").

55.     Thereafter, DIBIASE JR., acting in his capacity as an agent for FO, wrote check 1010 for $697,759.55 from account 2604 to fund account 2066. Substantially all these funds are traceable to the $700,000 in payments, described in the above paragraph, that FO received from FRC.

56.     On or about October 30, 2018, DIBIASE JR. acting in his capacity as an agent for FO, wrote check 1010 from account 2604 in the amount of $697,759.55 to account 2066, which, upon information and belief, caused the transmission of an interstate wire. At the time DIBIASE JR deposited this check into account 2066, that account had a zero balance. In addition, no further deposits were made into account 2066 before November 16, 2018.

57.     On or about November 16, 2018, DIBIASE JR. transferred $401,304.37 from account 2066 in the name of FO to account 4599, a personal account. Account 2066 had a $663,421.11 balance prior to the transfer. In making this transfer, DIBIASE JR. transferred, in his capacity as agent of FO, funds from the care, custody and control of FO to his own, personal control. Later that same day, DIBIASE JR. sent a wire in the amount of $401,304.37 from account 4599 to the account of an attorney at Bank Plus, for the down payment on the defendant property.

58.     When DIBIASE JR. initiated this wire for the purpose of executing a scheme or artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses,

representations or promises, he caused the transmission of a wire communication in interstate commerce of certain writings, signs, signals, and pictures, that is, by causing Renasant Bank to communicate with Bank Plus regarding the transfer of funds.

59.     The amount DIBIASE JR. wired to the attorney is the exact same amount transferred through the FO accounts, and most, if not all, of the funds in that wiring are traceable to proceeds of the wire fraud and theft of federal funds scheme and conspiracy described above.

60.     According to the warranty deed, the defendant property is currently owned by DIBIASE JR. and his wife, Kristen DiBiase.  The fact that the defendant property is not in FO's name, and is instead owned by DIBIASE JR. and his wife, indicates DIBIASE JR. purchased the defendant property for personal use.

61.     Thus, DIBIASE JR. used three bank accounts, at two separate banks, under two different account holders, to move a significant portion of the proceeds via wire transfer to make the down payment on and complete the purchase of the defendant property.  Three of the transfers occurred within seventeen days and two of those three movements of funds occurred on the same day.

62.     DIBIASE JR. was aware that the funds he moved through the accounts originated from the fraudulent contract between FO and FRC because DIBIASE JR. signed the contract as FO's agent, made no attempt to complete any work on it, accepted all of the money on behalf of FO, and then kept it for himself.

## IV.     BASIS FOR FORFEITURE

63.     Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 and 1957], or any property traceable to such property" is subject to forfeiture to the United States.

64.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to any violation of . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense" is subject to forfeiture to the United States.

65.     Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is a federal crime to, "knowing that the property involved in a transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

66.     Pursuant to 18 U.S.C. § 1957, it is a federal crime to "knowingly engage[] or attempt[] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."

67.     A "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) to include, among other things, wire fraud, in violation of 18 U.S.C. § 1343.

68.     A "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(D) to include, among other things, theft or bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).

69.     Title 18, United States Code, Section 981(f) provides that "[a]ll right, title, and interest in property described in subsection (a) of this section shall vest in the United States upon commission of the act giving rise to forfeiture under this section."

**FIRST CLAIM FOR FORFEITURE**
**Proceeds of Wire Fraud**
**(18 U.S.C. § 981(a)(1)(C))**

70.     The allegations contained in the paragraphs 1 through 69 of this Verified First Amended Complaint for Forfeiture are incorporated by reference herein.

17

71.     As set forth above, the defendant property constitutes or was derived from proceeds traceable to wire fraud, in violation of Title 18, United States Code, Section 1343.

72.     Accordingly, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR FORFEITURE
### Proceeds of Conspiracy to Commit Wire Fraud
### (18 U.S.C. §981(a)(1)(C))

73.     The allegations contained in the paragraphs 1 through 69 of this Verified First Amended Complaint for Forfeiture are incorporated by reference herein.

74.     As set forth above, the defendant property constitutes or was derived from proceeds traceable to a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349.

75.     Accordingly, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## THIRD CLAIM FOR FORFEITURE
### Proceeds of Theft or Bribery Concerning Programs Receiving Federal Funds
### (18 U.S.C. § 981(a)(1)(C))

76.     The allegations contained in the paragraphs 1 through 69 of this Verified First Amended Complaint for Forfeiture are incorporated by reference herein.

77.     As set forth above, the defendant property constitutes or was derived from proceeds traceable to theft or bribery concerning programs receiving Federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).

78.     Accordingly, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### FOURTH CLAIM FOR FORFEITURE
**Proceeds of Conspiracy to Commit Offense**
**(18 U.S.C. § 981(a)(1)(C))**

79.    The allegations contained in the paragraphs 1 through 69 of this Verified First Amended Complaint for Forfeiture are incorporated by reference herein.

80.    As set forth above, the defendant property constitutes or was derived from proceeds traceable to a conspiracy to commit an offense, in violation of Title 18, United States Code, Section 371, specifically, conspiracy to violate Title 18, United States Code, Section 666(a)(1)(A) (theft or bribery concerning programs receiving federal funds).

81.    Accordingly, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### FIFTH CLAIM FOR FORFEITURE
**Property Involved in Concealment Money Laundering**
**(18 U.S.C. § 981(a)(1)(A))**

82.    The allegations contained in the paragraphs 1 through 69 of this Verified First Amended Complaint for Forfeiture are incorporated by reference herein.

83.    As set forth above, the defendant property was involved in transactions or attempted transactions designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or control of proceeds of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and/or constitute property traceable to such property.

84.    Accordingly, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### SIXTH CLAIM FOR FORFEITURE
**Property Involved in Laundering Transactions Greater than $10,000**
**(18 U.S.C. § 981(a)(1)(A))**

85.    The allegations contained in the paragraphs 1 through 69 of this Verified First Amended Complaint for Forfeiture are incorporated by reference herein.

86.    As set forth above, the defendant property was involved in monetary transactions in property of a value greater than $10,000 that was derived from specified unlawful activity in violation of 18 U.S.C. § 1957, and/or constitutes property traceable to such property.

87.    Accordingly, the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE,** Plaintiff, the United States of America, requests that notice of this Verified First Amended Complaint be provided to persons known or thought to have an interest in or right against the defendant property, and such other and further relief as this Honorable Court may deem just, necessary, and proper.

**RESPECTFULLY SUBMITTED**, this 23rd day of August, 2022.

CURT BOHLING, Acting Chief
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice

By:    */s/ Adrienne E. Rosen*
Adrienne E. Rosen
New York Bar 4306767
Trial Attorney
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice
1400 New York Avenue, Northwest
Washington, DC 20005
(202) 616-2690
Adrienne.Rosen@usdoj.gov

DARREN J. LAMARCA
United States Attorney

By:

David H. Fulcher, MSB No. 10179
Assistant United States Attorney
501 E. Court Street – Suite 4.430
Jackson, MS 39201
601-973-2824
Dave.Fulcher@usdoj.gov

## **VERIFICATION**

I, Robert Culpepper, hereby verify and declare under penalty of perjury that I am a Special Agent with the FBI, that I have read the foregoing Amended Verified Complaint for Forfeiture *in Rem* and know the contents thereof, and that the matters contained in the Amended Verified Complaint for Forfeiture *in Rem* are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States of America, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as an FBI Agent.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated this the __23__ day of August, 2022.

Robert Culpepper
Special Agent
Federal Bureau of Investigation